**Not for Publication**

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

---

x

STANLEY YEDLOWSKI, etc.,            :
                                    :    **Case No. 14-CV-8020-FLW-TJB**
        Plaintiffs,                 :
                                    :
v.                                  :
                                    :
ROKA BIOSCIENCE, INC., *et al.*,    :
                                    :
        Defendants                  :
                                    :

---

x

## WOLFSON, United States District Judge:

Before the Court are the motions for final approval of a proposed settlement and an award of attorneys' fees and reimbursement of expenses filed by Lead Plaintiff Stanley Yedlowski, through counsel the Rosen Law Firm, PA. This settlement will resolve all claims asserted against Defendants Roka Bioscience, Inc., Paul G. Thomas, and Steven T. Sobieski. Defendants, through counsel Proskauer Rose LLP, support the motions for final approval of settlement and take no position on the motion for an award of attorneys' fees and reimbursement of expenses.

For the reasons set forth below, Lead Plaintiff's motion for final approval of the parties' $3.275 million settlement is granted. Lead Counsel is awarded $982,500 in attorney's fees and $20,972.82 in costs. Lead Plaintiff is awarded the nominal sum of $3,000. All attorney's fees, costs, and nominal awards are payable from the settlement fund.

**I. FACTUAL BACKGROUND**

This case is a securities class action brought on behalf of investors who bought Roka common stock in, pursuant to, or traceable to, Roka's July 17, 2014 Initial Public Offering, including persons who bought Roka common stock between July 17, 2014 and March 26, 2015.

Defendant Roka sells tests to detect foodborne pathogens to large-scale food testers such as food manufacturers and commercial testing labs. Roka's tests can only be run on its stand-alone, single purpose platform. In March 2014, shortly before the IPO, Roka discovered that with some customers, its test to detect *Listeria* (a foodborne pathogen) generated unacceptable levels of false positives, i.e., incorrect results showing that a testing sample contains *Listeria* when it does not. Roka implemented a change in the test protocol to reduce the chances of false positives.

Roka's IPO registration statement (the "IPO Registration Statement") disclosed that Roka's *Listeria* test had generated sporadic false positives. The IPO Registration Statement also represented that the change in the test protocol had adequately addressed customers' false positives problems. Roka held its IPO in July 2014, selling its stock at $12/share, raising $55.8 million.

The Complaint alleges that by the time of the IPO, Defendants already knew, but did not disclose, that (a) Roka's solution to the problem of false positives for *Listeria* had failed, and (b) Roka had begun to lose customers because of the *Listeria* false positives. The Complaint alleges that in the run up to the IPO, Roka received daily complaints of Listeria false positives and that five of Roka's testing platforms had been returned by dissatisfied customers. The Complaint also alleges that Roka received regular complaints from its customer Silliker, a testing lab which ran Roka's tests for food producer Hillshire Farm. The Complaint alleges that Hillshire Farm

stopped using Roka's tests altogether before the IPO because it could not trust the *Listeria* test results.

In a November 6, 2014 conference call and press release, Roka announced that the *Listeria* false positives problem had caused its revenue growth to stall. Lead Plaintiff alleges that because of Roka's precarious financial condition, the stall dramatically increased the chance that Roka would ultimately fail. The next trading day, Roka's stock price fell from its previous close of $8.34 to close at $3.00. The Complaint alleges that the market only learned the true scope of the false positives problem when, on March 26, 2015, following another quarter of zero sales growth, Roka announced that its sales would not increase substantially until Roka replaced the *Listeria* tests. Roka's stock price fell from $4.01 to $3.13 over the next two trading days.

## II. PROCEDURAL HISTORY

This Action was filed on December 24, 2014. In April 2015, the Court appointed Mr. Stanley Yedlowski as Lead Plaintiff and The Rosen Law Firm, P.A. as Lead Counsel. Lead Plaintiff and named plaintiff Pratik Pitroda ("Plaintiffs") timely filed their Complaint alleging violations of Section 11 of the Securities Act of 1933 (the "Exchange Act") against Defendants Roka, Thomas, and Sobieski.

In July 2015, following appointment of Lead Plaintiff and Lead Counsel and filing of an Amended Complaint, Defendants filed a letter motion seeking to have the Court strike, discount, or otherwise limit consideration of facts the Amended Complaint attributed to confidential witnesses. After considering Defendants' letter, Plaintiffs' response, and Defendants' reply, the Court declined to award any of the relief sought in Defendants' letter motion.

In September 2015, Defendants filed a motion to dismiss the Amended Complaint. A month later, Plaintiffs filed their opposition. The Court then stayed further briefing on Defendants' motion to dismiss while the Parties explored settlement discussions. To facilitate settlement discussions, the Settling Parties retained a mediator, the Hon. Faith S. Hochberg, U.S.D.J. (Ret.). Prior to a formal mediation, the parties submitted confidential mediation statements and replies.

The Settling Parties then held an all-day mediation before Judge Hochberg on December 15, 2015. Defendants' insurer also attended the mediation. There, the Parties signed a settlement term sheet, whose principal term was that the Action would be dismissed for a cash payment of $3.275 million.

The Parties then negotiated and drafted the Settlement Agreement. Plaintiffs filed for preliminary approval on May 20, 2016, and, on June 28, 2016, the Court granted Plaintiffs' motion; preliminarily approved the proposed settlement; certified the putative class for settlement purposes; approved the form and content of the proposed Individual Notice, Claim Form, and Summary Notice; authorized the mailing and publication of the notice materials; and scheduled a Fairness Hearing for November 9, 2016.

The Stipulation was conditioned on Lead Plaintiff's ability to conduct confirmatory discovery to determine whether the underlying facts were consistent with Lead Plaintiff's original understanding that the proposed settlement is fair, reasonable, and adequate. Defendants therefore made available to Lead Counsel some 8,074 documents, consisting of more than 377,000 pages.

The production consisted of documents from March 1 through August 31, 2014 that fit into at least one of the following categories: (*i*) documents that were generated by anyone on a

4

list of Roka custodians who had been involved with the *Listeria* assay and that included at least one term on a list of search terms relating to the *Listeria* assay; (*ii*) minutes of meetings of Roka's Senior Management Team, and materials generated in preparation for those meetings; (*iii*) minutes of Roka's Board of Directors, and materials generated in preparation for those meetings; or (*iv*) Roka's complaint log during the relevant time period. Lead Counsel and defendants' counsel engaged in arm's-length negotiations to determine the lists of custodians and search terms used to generate the confirmatory discovery production.

Lead Counsel also interviewed three present or former Roka officials or employees, including Roka's former Chief Financial Officer and its Director of Product Marketing. After conducting their review, Lead Counsel and its clients have represented to the court that they continue to believe that the proposed settlement is fair, reasonable, and adequate and in the best interests of the Class.

On or before July 21, 2016, the Claims Administrator (Strategic Claims Services ("SCS")) mailed copies of the Court-approved Individual Notice and Claim Form by first-class mail to 49 potential Class Members for whom address information was available from Roka's transfer agent. SCS also mailed the notice materials to another 1,524 custodial banks and other institutions identified from SCS's proprietary databases. SCS later mailed the notice materials to an additional 2,582 potential Class Members identified by nominees or other individuals. Thus, SCS sent a total of 4,155 sets of notice materials to potential Class Members and Nominees. In addition, SCS sent the Individual Notice and Claim Form to the Depository Trust Company (the "DTC") for publication on the Legal Notice System. SCS also caused the Court-approved Summary Notice to be published once in *The Wall Street Journal* and in *Investor's Business*

5

*Daily*, as well as on *Globe Newswire*. SCS also posted information and documents about the proposed settlement on its website.

The matter came before the Court for a Fairness Hearing on November 9, 2016. Counsel for the parties appeared. The parties did not appear. Lead Plaintiff's Counsel represented on the record that given the number of eligible claims that had been received, the projected recovery for individual class members would be between 16% and 18.5% of their losses, depending upon the number of currently deficient claims that may later be cured. With neither party wishing to make any additional supplements to the record, the Court summarized its findings, to be set forth in the opinion to follow.

## III. TERMS OF SETTLEMENT

On May 17, 2016, the parties' counsel executed a Stipulation setting forth the terms of the settlement. The proposed settlement agreement provides for a payment of $3.275 million in cash (the "Settlement Amount") into a settlement fund to resolve all claims in this action. The $3.275 million has been paid into an escrow account in accordance with the terms of the Stipulation.

The Stipulation also states that notice and administrative costs, as well as Lead Counsel's fees and expenses, will be paid from the settlement fund. The remainder of the fund will be distributed to eligible Class Members. The Stipulation does not specify an allocation between Plaintiff's counsel and the class, leaving that issue for Lead Plaintiff's application to this Court.

## IV. JURISDICTION

This Court has subject-matter jurisdiction over Plaintiffs' claims under § 22 of the Securities Act, 15 U.S.C. § 77v, as well as under the general federal-question statute, 28 U.S.C. § 1331. The Court has personal jurisdiction over defendants, plaintiffs, and all other Class

Members. "In the class action context, the district court obtains personal jurisdiction over the absentee class members by providing proper notice of the impending class action and providing the absentees with the opportunity to be heard or the opportunity to exclude themselves from the class." In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 306 (3d Cir. 1998).

## V. CLASS CERTIFICATION

The Third Circuit has consistently observed that "Rule 23 is designed to assure that courts will identify the common interests of class members and evaluate the named plaintiffs' and counsel's ability to fairly and adequately protect class interests." In re Comm. Bank of N. Va., 622 F.3d 275, 291 (3d Cir. 2010) (quoting In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation, 55 F.3d 768, 799 (3d Cir. 1995) (alterations omitted). In order to approve a class settlement agreement, "a district court must determine that the requirements for class certification under Federal Rule of Civil Procedure 23(a) and (b) are met and must determine that the settlement is fair to the class under Federal Rule of Civil Procedure 23(e)." In re Insurance Brokerage Antitrust Litigation, 579 F.3d 241, 257-58 (3d Cir. 2009); In re Pet Food Prods. Liab. Litig., 629 F.3d 333, 341 (3d Cir. 2010). ("a district court first must determine that the requirements for class certification under Rule 23(a) and (b) are met.")

"The requirements of [Rule 23] (a) and (b) are designed to insure that a proposed class has 'sufficient unity so that absent class members can fairly be bound by decisions of class representatives.'" In re Prudential Ins. Co., 148 F.3d at 309 (quoting Amchem, 521 U.S. at 621). Under Rule 23(a), the prerequisites to class certification are:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or

defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class

Fed. R. Civ. P. 23(a); see also Amchem Products, Inc. v. Windsor, 521 U.S. 591, 613 (1997).

"Upon finding each of these prerequisites satisfied, a district court must then determine that the

proposed class fits within one of the categories of class actions enumerated in Rule 23(b)."

Sullivan v. DB Investments, Inc., 667 F.3d 273, 296 (3d Cir. 2011).

Certification pursuant to Rule 23(b)(3), applicable in cases like the one presently before

the Court in which Plaintiffs seek monetary compensation, is permitted where (1) "questions of

law or fact common to class members predominate over any questions affecting only individual

members," and (2) "a class action is superior to other available methods for fairly and efficiently

adjudicating the controversy." Fed.R.Civ.P. 23(b)(3); see Collins v. E.I. DuPont de Nemours &

Co., 34 F.3d 172, 180 (3d Cir. 1994); Amchem, 521 U.S. at 618 ("Among current applications of

Rule 23(b)(3), the 'settlement only' class  has become a stock device"). The "factual

determinations necessary to make Rule 23 findings must be made by a preponderance of the

evidence. In other words, to certify a class the district court must find that the evidence more

likely than not establishes each fact necessary to meet the requirements of Rule 23." In re

Insurance Brokerage, 552 F.3d at 258 (citations and internal quotations omitted). Accordingly,

"[c]lass certification is proper only if the [] court is satisfied, after a rigorous analysis, that the

prerequisites of Rule 23 are met." Id. (internal quotation marks omitted).

"Even if it has satisfied the requirements for certification under Rule 23, a class action

cannot be settled without the approval of the court and a determination that the proposed

settlement is fair, reasonable and adequate." In re Prudential Ins. Co., 148 F.3d at 316 (internal

quotation marks omitted); see Fed. R. Civ. P. 23(e)(2) (stating that a district court may approve a proposed settlement "only after a hearing and on finding that it is fair, reasonable, and adequate"). In In re Insurance Brokerage the Third Circuit affirmed the applicability of nine factors, established in Girsh v. Jepson 521 F.2d 153, 157 (3d Cir. 1975), which are to be considered when determining the fairness of a proposed settlement. "In cases of settlement classes, where district courts are certifying a class and approving a settlement in tandem, they should be 'even more scrupulous than usual when examining the fairness of the proposed settlement.'" In re Nat'l Football League Players Concussion Injury Litig., 821 F.3d 410, 436 (3d Cir. 2016), as amended (May 2, 2016) (quoting In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 534 (3d Cir. 2004)).

Finally, as the Supreme Court has observed, when "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial. But other specifications of [Rule 23] -- those designed to protect absentees by blocking unwarranted or overbroad class definitions -- demand undiluted, even heightened, attention in the settlement context." Amchem, 521 U.S. at 620 (citation omitted); see Id.  "[I]f a fairness inquiry under Rule 23(e) controlled certification, eclipsing Rule 23(a) and (b), and permitting class designation despite the impossibility of litigation, both class counsel and court would be disarmed." Id. at 621. Thus, it is important to "apply[] the class certification requirements of Rules 23(a) and (b) separately from [the] fairness determination under Rule 23(e)." In re Prudential Ins. Co., 148 F.3d at 308.

Plaintiffs move to certify a class of investors who bought Roka common stock in, pursuant to, or traceable to, Roka's July 17, 2014 Initial Public Offering, including persons who bought Roka common stock between July 17, 2014, and March 26, 2015.

## A. Rule 23(a) Factors

The Court first determines whether Plaintiffs have satisfied the prerequisites for maintaining a class action as set forth in Rule 23(a).

### 1. Numerosity

With respect to numerosity, a party need not precisely enumerate the class members to proceed as a class action.  In re Lucent Tech. Inc., Sec. Litig., 307 F. Supp. 2d 633, 640 (D.N.J. 2004).  "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001) (citing 5 James Wm. Moore et al., Moore's Federal Practice S 23.22[3][a] (Matthew Bender 3d ed. 1999).

Here, Roka's stock was listed on the NASDAQ, and more than 14 million of its shares were traded during the Class Period and 2,631 potential class members have been identified. The numerosity requirement has been met.

### 2. Commonality

Commonality requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The threshold for establishing commonality is straightforward: "[t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." In re Schering Plough Corp. ERISA Litig., 589 F.3d 585, 596-97 (3d Cir. 2009) (quoting Baby Neal v. Casey, 43 F.3d 48, 56 (3d Cir.

1994)) (emphasis added).  Indeed, as the Third Circuit pointed out, "[i]t is well established that only one question of law or fact in common is necessary to satisfy the commonality requirement, despite the use of the plural 'questions' in the language of Rule 23(a)(2)."  In re Schering Plough, 589 F.3d at 97 n.10.  Thus, there is a low threshold for satisfying this requirement. Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 183 (3d Cir. 2001); In re Sch. Asbestos Litig., 789 F.2d 996, 1010 (3d Cir. 1986) (highlighting that the threshold of commonality is not high (quotations and citations omitted)).

Moreover, this requirement does not mandate that all putative class members share identical claims, see Hassine v. Jeffes, 846 F.2d 169, 176-77 (3d Cir. 1988), and that "factual differences among the claims of the putative class members do not defeat certification." Baby Neal, 43 F.3d at 56.  In that regard, class members can assert a single common complaint even if they have not all suffered actual injury; demonstrating that all class members are subject to the same harm will suffice. Hassine, 846 F.2d at 177-78. "Even where individual facts and circumstances do become important to the resolution, class treatment is not precluded."  Baby Neal, 43 F.3d at 56.

Courts will usually find commonality if the plaintiffs charge defendants with a common course of misconduct – particularly where, like here, the misrepresentations appeared in the Defendants' public statements that were disseminated to all investors. See, e.g., In re Schering-Plough Corp./ENHANCE Sec. Litig., No. CIV.A. 8-397 DMC/JAD, 2012 WL 4482032, at *4 (D.N.J. Sept. 25, 2012).

**3. Typicality**

Rule 23(a)(3) requires that the representative's claim be typical of those of the members of the class. "The concepts of commonality and typicality are broadly defined and tend to merge,

11

because they focus on similar aspects of the alleged claims." Newton, 259 F.3d at 182. "Both criteria seek to assure that the action can be practically and efficiently maintained and that the interests of the absentees will be fairly and adequately represented." Baby Neal, 43 F.3d at 56; see General Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 157 n.13 (1982). Despite their similarity, commonality – like numerosity – evaluates the sufficiency of the class itself, and typicality – like adequacy of representation – evaluates the sufficiency of the named plaintiff. See Hassine, 846 F.2d at 177 n.4; Weiss v. York Hosp., 745 F.2d 786, 810 (3d Cir. 1984), cert. denied, 470 U.S. 1060 (1985).

  Specifically, Rule 23(a)(3) requires that "the claims . . . of the representative parties [be] typical of the claims of the class." See Fed. R. Civ. P. 23(a)(3).   Typicality acts as a bar to class certification only when "the legal theories of the named representatives potentially conflict with those of the absentees." Georgine v. Amchem Prods., 83 F.3d 610, 631 (3d Cir. 1996); Newton, 259 F.3d 183.  "If the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences." Id. at 184.  In other words, the typicality requirement is satisfied as long as representatives and the class claims arise from the same event or practice or course of conduct and are based on the same legal theory.  Brosious v. Children's Place Retail Stores, 189 F.R.D. 138, 146 (D.N.J. 1999); Hoxworth v. Blinder, Robinson & Co., 980 F.2d 912, 923 (3d Cir.1992) ("Factual differences will not render a claim atypical if the claim arises from the same event or practice of course of conduct that gives rise to the claims of the class members, and it is based on the same legal theory.").

  Here, Lead Plaintiff's claims are similar to those of the other members of the Class. As evidenced by his sworn Certification, Lead Plaintiff bought Roka stock during the Class Period.

Just like the other members of the proposed Class, Lead Plaintiff bought Roka stock in response to, or pursuant to or traceable to, Roka's Registration Statement, which allegedly contained false statements, and suffered damages when the false statements materialized. His claims stand or fall with those of the class. Accordingly, Lead Plaintiff's claims are typical.

## 4. Adequacy

A class may not be certified unless the representative class members "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4). "Rule 23(a)'s adequacy of representation requirement 'serves to uncover conflicts of interest between named parties and the class they seek to represent.'" In re Pet Food Prod. Liab. Litig., 629 F.3d 333, 343 (3d Cir. 2010) (quoting Amchem, 521 U.S. at 625).  Class representatives "must be part of the class and possess the same interest and suffer the same injury as the class members." Id. (citation and internal quotation marks omitted).

This requirement has traditionally entailed a two-pronged inquiry: first, the named plaintiff's interests must be sufficiently aligned with the interests of the absentees; and second the plaintiff's counsel must be qualified to represent the class. General Motors, 55F.3d at 800; Newton, 259 F.3d at 187 (same). A named plaintiff is "adequate" if his interests do not conflict with those of the Class. In re Prudential Ins. Co., 148 F.3d at 312. Pursuant to Rule 23(g), adequacy of class counsel is considered separately from the determination of the adequacy of the class representatives. Both prongs of the adequacy requirement are satisfied here.

## (i) Adequacy of the Proposed Class Representative

Lead Plaintiff has no interests that are antagonistic to those of the members of the proposed Class and has no unique defenses from the proposed Class. Lead Plaintiff purchased Roka stock traceable to the Registration Statement. Lead Plaintiff, on his own behalf and on

behalf of all members, seeks to recover from Defendants damages caused by Defendants' alleged unlawful conduct. Lead Plaintiff's interests are congruent with and not antagonistic to other Class Members' interests.

### (ii) Rule 23(g) Adequacy of the Proposed Class Counsel

Rule 23(g) requires a court to assess the adequacy of proposed class counsel. To that end, the court must consider the following: (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources counsel will commit to representing the class. Nafar v. Hollywood Tanning Sys., Inc., No. 06-CV-3826 DMC, 2008 WL 3821776, at *7 (D.N.J. Aug. 12, 2008). Lead Counsel has successfully prosecuted securities class actions in courts throughout the country. In this action, Lead Counsel has devoted considerable time to, inter alia, researching and filing the initial and amended complaints, responding to Defendants' motion to dismiss, and reaching and negotiating the specific terms of the Settlement Agreement. Lead Counsel should be appointed as counsel to the Settlement Class.

### B. Rule 23(b)(3) Factors: Common Questions Predominate and the Class Is Superior to Other Methods of Adjudication

After meeting the threshold requirements of Rule 23(a), a plaintiff must establish that the proposed class meets the requirements of Rule 23(b)(3). To certify a class under Rule 23(b)(3), the Court must find that: [T]he questions of law or fact common to the members of the class predominate over any question affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Rule 23(b)(3) requires that "a class action [be] superior to other available methods for the fair

14

and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). In this case, both considerations weigh in favor of class certification.

Here, Lead Plaintiff satisfies the predominance and superiority criteria of Rule 23(b)(3). In determining whether common questions predominate, courts have focused on the claims of liability against defendants. See Bogosian v. Gulf Oil Corp., 561 F.2d 434, 456 (3d Cir. 1977). Smith, 2007 WL1217980, at * 9 (citing cases)("The focus of the predominance inquiry is on liability, not damages."). When common questions are a significant aspect of a case and they can be resolved in a single action, class certification is appropriate. See 7A Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d, § 1788, at 528 (1986).

Here, the existence of common questions and their predominance over individual issues are exemplified by the fact that if every class member were to bring an individual action, each plaintiff would be required to demonstrate the same omissions or misrepresentations to prove liability. Thus, this case is an example of the principle that the predominance requirement is "readily met" in many securities class actions. Amchem, 521 U.S. at 625. The Rule sets out several factors relevant to the superiority inquiry: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action.  Essentially, the superiority requirement "asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." In re Prudential Ins. Co., 148 F.3d at 316 (internal citations and quotations omitted); In re Warfarin, 392 F.3d at 532-33.  Many, if not most, of the Class members are

15

individuals for whom prosecution of a costly damages action on their own behalf is not a realistic or efficient alternative. The District of New Jersey is an appropriate forum because all Defendants reside here.

As to Rule 23(b)(3)(D), there will be no difficulties in managing this Settlement Class. This Court balances the fairness and efficiency of certifying a class against other possible methods of adjudication. Without a class action, investors who have been defrauded by securities law violations but whose losses do not run into several million dollars would likely have no practical recourse. See Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 809 (1985) ("[m]ost of the plaintiffs would have no realistic day in court if a class action were not available.") And if individuals do have the means to litigate their own action, absent a class action, this Court might have to try numerous lawsuits. Good v. Nationwide Credit, Inc., No. CV 14-4295, 2016 WL 929368, at *8 (E.D. Pa. Mar. 14, 2016); see also Smilow, 323 F.3d at 41 ("The core purpose of Rule 23(b)(3) is to vindicate the claims of … groups of people whose individual claims would be too small to warrant litigation"). Thus, a class action is the superior method of adjudication and satisfies Rule 23(b)(3).

Moreover, solely for the purposes of settlement, Defendants do not dispute that the Class should be certified in accordance with Rule 23(b)(3).

Finally, when confronted with a request for settlement-only class certification, the Court need "not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial." Amchem, 521 U.S. at 620.

As stated earlier, common legal and factual questions are shared amongst the class members and Plaintiffs in this action.  Specifically, class members and Plaintiffs challenge the same alleged omissions or misrepresentations. Having weighed all the factors and considered all

the requirements of class certification, the Court finds that it is appropriate to certify the class for settlement purposes.

## VI. ADEQUACY OF NOTICE

The Court ruled in the Preliminary Approval Order that the class-notice materials and the proposed method of dissemination (by first-class mail and publication) met the requirements of due process, Rule 23 of the Federal Rules of Civil Procedure, and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), "constitute[d] the best notice practicable under the circumstances, and constitute[d] due and sufficient notice to all persons entitled to such notice."  Now that notice has been provided to the Class, the Court reaffirms its earlier findings concerning the adequacy of the Notice Program.

Where, as here, the parties have sought simultaneously to certify a settlement class and settle a class action, the Court must consider Fed. R. Civ. P. 23(c)(2)'s notice requirements for class certification as well as Rule 23(e)'s notice requirements for settlement or dismissal.  See, e.g., In re Prudential Ins. Co., 148 F.3d at 326-27.

For classes certified under Fed. R. Civ. P. 23(b)(3), such as the Class in this action, Rule 23(c)(2)(B) requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  The Rule also prescribes that the notice state "(i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on class members under Rule 23(c)(3)."  *Id.*

Rule 23(e) is less specific, requiring only that notice of a proposed settlement be given "in a reasonable manner."  Thus, if the notice satisfies Rule 23(c), it will also satisfy Rule 23(e). See, e.g., In re Global Crossing Sec. & ERISA Litig., 225 F.R.D. 436, 448 (S.D.N.Y. 2004). The Constitution's Due Process Clause also imposes certain minimum notice requirements.  As the Supreme Court has observed, however, the "'mandatory notice pursuant to [Rule 23(c)(2)] . . . is designed to fulfill requirements of due process to which the class action procedure is of course subject.'"  Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 173-74 (1974) (quoting Fed. R. Civ. P. 23, 1966 Amendment Advisory Comm. Note to Subdiv. (d)(2)). Due process considerations are therefore satisfied if the notice conforms to Rule 23(c)(2).

Additionally, the Securities Act, in provisions added by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), imposes certain notice requirements specifically for settlements of securities class actions.  See 15 U.S.C. § 77z-1.  The PSLRA requires that the notice contain the following information:

- Statement of recovery – "[t]he amount of the settlement proposed to be distributed to the parties to the action, determined in the aggregate and on an average per share basis";

- Statement of potential outcome of case – the amount of damages per share recoverable if the plaintiffs were to prevail on every claim, but, if the parties are unable to agree on damages, "a statement from each settling party concerning the issue or issues on which the parties disagree";

- Statement of attorneys' fees – a statement of fees and costs to be applied for in the aggregate and on an average per-share basis;

- Identification of lawyers' representatives – the name, telephone number, and address of counsel available to answer questions; and

- Reasons for settlement – "[a] brief statement explaining the reasons why the parties are proposing the settlement."

*Id.* The notice must also include a cover page summarizing all of these topics. *Id.*

## A. Best Practicable Notice Methodology

The means by which notice was provided to potential Class Members met all applicable requirements for adequacy of notice and due process. The Individual Notice was sent by first class mail to all potential Class Members who could be identified through reasonable efforts – meaning all potential Class Members for whom names and addresses were available. In addition to mailing the Individual Notices to all potential Class Members for whom it had names and addresses, the Claims Administrator mailed the Individual Notices to thousands of nominees and other institutions that might have purchased Roka common stock beneficially owned by potential Class Members. The Claim Administrator also posted the Individual Notice (as well as other documents relating to the lawsuit and the settlement) on its website. The website and the notice materials provided telephone numbers (including a toll-free number) that potential Class Members could call if they had questions. The Claims Administrator also arranged for publication of the Court-approved Summary Notice in *The Wall Street Journal* and *Investor's Business Daily* as well as on wire services.

The Summary Notice contained pertinent information about the class action and settlement required by Rules 23(c)(2) and 23(e) and by principles of due process.

These procedures fully satisfied Rule 23(c)(2)'s requirement of individual notice "to all members who can be identified through reasonable effort." See, e.g., In re Global Crossing Sec.

& ERISA Litig., 225 F.R.D. at 449 (notice by first-class mail, publication of summary notice, posting on website, and toll-free number collectively satisfied Rule 23(c)(2)'s requirements).

**B. Sufficient Content of the Notice**

The potential Class Members will have received the "best notice that is practicable under the circumstances" as required by Rule 23(c)(2) if the notice "contain[s] sufficient information to enable class members to make informed decisions on whether they should take steps to protect their rights, including objecting to the settlement or, when relevant, opting out of the class." In re Nat'l Football League Players Concussion Injury Litig., 821 F.3d 410, 435 (3d Cir. 2016) (internal quotations omitted).  The notice in this case met that standard.

The notice materials informed potential Class Members of the relevant aspects of the claims in the Complaint and the terms of the proposed settlement, including:

- The nature of the case, a statement of the claims and defenses, and a statement about how the settlement fund will be allocated among eligible Class Members if the proposed settlement is approved;

- The right of potential Class Members to exclude themselves from the Class, to object to any aspect of the proposed settlement, or to appear at the Fairness Hearing – and the processes and deadlines for doing so;

- The date of the Fairness Hearing;

- The terms of the release of claims; and

- The binding effect of any judgment – whether favorable or not – on all persons who do not exclude themselves from the Class, and the impact on Class Members if the proposed settlement is approved.

20

The content of the notice thus complied with Rule 23(c)(2).  See, e.g., In re Ins. Brokerage

Antitrust Litig., 282 F.R.D. 92, 109-10 (D.N.J. 2012) (approving settlement notices after finding

that they included all essential elements to properly apprise class members of their rights).

In addition, consistent with the requirements of the PSLRA, the Individual Notice:

- Set out the amount of the settlement on an aggregate and a per-share basis, as well

  as the proposed plan of distribution;

- Informed potential Class Members of the parties' disagreement regarding

  damages and explained each party's position on that issue;

- Stated the amount of attorneys' fees and expenses sought on an aggregate and a

  per-share basis;

- Provided potential Class Members with the name, address, and telephone number

  of Lead Counsel; and

- Explained why the parties proposed the settlement.

The Individual Notice thus met the PSLRA's requirements.  See, e.g., In re Cendant Corp. Sec.

Litig., 109 F. Supp. 2d 235, 254-55 (D.N.J. 2000) (approving notice based on consideration of

PSLRA factors), aff'd, 264 F.3d 201 (3d Cir. 2001).

Accordingly, the notice procedures and the contents of the Individual Notice and the

Summary Notice satisfied all applicable requirements, including those of Rules 23(c)(2) and

23(e), the PSLRA, and the U.S. Constitution.  See, e.g., In re Prudential Ins. Co., 148 F.3d at

328; In re AremisSoft Corp. Sec. Litig., 210 F.R.D. 109, 119-20 (D.N.J. 2002) (approving

similar notice procedures and content).  The Court therefore reaffirms its finding in the

Preliminary Approval Order that the notices and notice methodology were the best practicable

under the circumstances and met all applicable requirements and finds that the Notice Program was implemented as required by the Preliminary Approval Order.

## VII. FINAL APPROVAL OF SETTLEMENT

At the outset, the Court expresses that the law encourages and favors settlement of civil actions in federal courts, particularly in complex class actions.  In re Warfarin, 391 F.3d at 535; see In re General Motors, 55 F.3d 768, 784 (3d Cir. 1995)("the law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation").  Accordingly, when a settlement is reached on terms agreeable to all parties, it is to be encouraged.  Bell Atlantic Corp. v. Bolger, 2F.3d 1304, 1314 n.16 (3d Cir. 1993). The Third Circuit applies "an initial presumption of fairness in reviewing a class settlement when:  (1) the negotiations occurred at arms [sic] length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected."  In re Nat'l Football League, 821 F.3d at 436 (internal quotations omitted).  This presumption applies even where, as here, "the settlement negotiations preceded the actual certification of the class . . . ."  In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 535 (3d Cir. 2004).

This Court observes that Judge Hochberg has signed a Declaration (submitted with plaintiffs' motion papers) attesting to the integrity of the mediation process and recommending the proposed settlement as "reasonable, hard-fought, arm's length, and fairly reflective of the risks and potential rewards of the claims being settled" [Hochberg Decl., ¶ 9]. The Court finds that the negotiations between the parties were at arm's length. As will be made clear in the Court's further analysis, the other relevant factors in this case indicate that the proposed settlement is entitled to an initial presumption of fairness.

22

Nevertheless, a class action settlement may not be approved under Rule 23(e) without a determination by this Court that the proposed settlement is "fair, reasonable and adequate." See In re Cendant, 264 F.3d at 231; see also Fed. R. Civ. P. 23(e)(1)(A).  The Third Circuit has on several occasions stressed the importance of Rule 23(e), noting that "the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members." In re General Motors, 55 F.3d at 785 (citations and quotations omitted); see also Amchem, 521 U.S. at 623 (noting that the Rule 23(e) inquiry "protects unnamed class members from unjust or unfair settlements affecting their rights when the representatives become fainthearted before the action is adjudicated or are able to secure satisfaction of their individual claims by a compromise") (citations omitted). However, in cases such as this, where settlement negotiations precede class certification and approval for settlement and certification are sought simultaneously, the Third Circuit requires district courts to be even "more scrupulous than usual" when examining the fairness of the proposed settlement.  See In re General Motors, 55 F.3d at 805. This heightened standard is intended to ensure that class counsel has engaged in sustained advocacy throughout the course of the proceedings, particularly in settlement negotiations, and has protected the interests of all class members. See In re Prudential Ins. Co., 148 F.3d at 317.

As this Court observed earlier, the Third Circuit has articulated a set of nine "Girsh factors" that courts should consider when determining the fairness of a proposed settlement:

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability;

(5) the risks of establishing damages;

(6) the risks of maintaining the class action through the trial;

(7) the ability of the defendants to withstand a greater judgment;

(8) the range of reasonableness of the settlement fund in light of the best possible

recovery; [and]

(9) the range of reasonableness of the settlement fund to a possible recovery in light of all

the attendant risks of litigation.

Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975) (internal quotations omitted); see, e.g., In re

Johnson & Johnson Deriv. Litig., 900 F. Supp. 2d 467, 479-85 (D.N.J. 2012) (reciting and

applying the Girsh factors). "The settling parties bear the burden of proving that the Girsh factors

weigh in favor of approval of the settlement." In re Pet Food Prods., 629 F.3d at 350. "A district

court's findings under the Girsh test are those of fact." In re Nat'l Football League, 821 F.3d at

437, as amended (May 2, 2016).

Since Girsh, the Third Circuit has held that, "because of a 'sea-change in the nature of

class actions' after Girsh was decided thirty-five years ago, it may be helpful to expand the Girsh

factors to include, when appropriate, the following non-exclusive factors":

[1] [T]he maturity of the underlying substantive issues . . . ; [2] the existence and

probable outcome of claims by other classes and subclasses; [3] the comparison between

the results achieved by the settlement for individual class or subclass members and the

results achieved – or likely to be achieved – for other claimants; [4] whether class or

subclass members are accorded the right to opt out of the settlement; [5] whether any

provisions for attorneys' fees are reasonable; and [6] whether the procedure for

processing individual claims under the settlement is fair and reasonable.

In re Pet Food Prods., 629 F.3d at 350 (quoting In re Prudential Ins. Co., 148 F.3d at 323).
"Unlike the Girsh factors, each of which the district court must consider before approving a class
settlement, the Prudential considerations are just that, prudential."   In re Nat'l Football League
Players, 821 F.3d at 437 (internal quotations omitted). The Girsh and Prudential factors are well
established law and their continued application in the class settlement context has been
reaffirmed by Third Circuit as recently as April of this year. See In re Nat'l Football League
Players, 821 F.3d at 437.

      The proposed settlement here satisfies the Girsh factors as well as the applicable
Prudential considerations.

## A. Complexity, Expense, and Likely Duration of Litigation

      The first Girsh factor captures "the probable costs, in both time and money, of continued
litigation."  In re Gen. Motors, 55 F.3d at 812. "By measuring the costs of continuing on the
adversarial path, a court can gauge the benefit of settling the claim amicably." Id. "Settlement is
favored under this factor if litigation is expected to be complex, expensive and time consuming."
In re Royal Dutch/Shell Transp. Sec. Litig., 2008 WL 9447623, at *17 (D.N.J. Dec. 9, 2008).

      "Federal securities class actions by definition involve complicated issues of law and
fact." Id.  This case is no exception. Continued litigation and trial of this action would require
the parties to investigate and the Court to adjudicate numerous complicated factual issues,
including:

      •      Each of Roka's customers' experience with the Listeria assay before Roka
      promulgated its new process;

      •      Each customer's experience with the Listeria assay after promulgation of the new
      process;

- The extent to which each customer was following the new workflow and/or adhering to good laboratory practices;

- The information that Roka (and especially Roka's management and Board) received about each customer's ability to use the *Listeria* assay successfully – both before and after the new process was promulgated;

- Roka's belief that customers would be able to employ the new workflow and that the new process would suffice to solve customers' false-positive problems;

- Roka's consideration of the prospect of adopting a modified, "detuned" *Listeria* assay;

- Roka's financial position; and

- Roka's public disclosures relating to all of the above matters.

Plaintiff's Post Settlement Discovery involved reviewing over 8,000 documents; full-blown discovery would involve hundreds of thousands. Plaintiff would have to review vast stores of internal correspondence, correspondence with underwriters and customers, and scientific materials and test results. The Parties would crisscross the country taking depositions of current and former employees of Roka, Roka's customers, and the IPO underwriters, at great cost. Plaintiff identified several potential witnesses who reside in various parts of California; several who reside in Ohio; several who reside in New Jersey and New York; and several who reside in Pennsylvania.

In addition, Defendants would take the depositions of Plaintiffs, and of Plaintiffs' experts (who reside in North Carolina and Buffalo), and Plaintiffs would take the depositions of Defendants' experts.  To survive summary judgment, and at trial, Plaintiff would require expert testimony on – at a minimum – scientific issues, class action damages, and loss causation. In re

Pfizer Inc. Sec. Litig., No. 4-CV-9866-LTS-HBP, 2014 WL 3291230, at *3 (S.D.N.Y. July 8, 2014), vacated on other grounds, 819 F.3d 642 (2d Cir. 2016) (granting summary judgment because "Plaintiffs' failure to proffer admissible [expert] loss causation and damages evidence is fatal to Plaintiffs' claims."). Indeed, while this case is still in the pleadings stage, Plaintiff has already consulted with experts on two of these topics (scientific issues and damages).

In addition, the parties would need to litigate and the Court would need to adjudicate damages issues and the loss-causation defense available to defendants under the Securities Act. Many of those issues would involve complex expert testimony on pathogen testing, damages, and loss causation.  Continued litigation of this case would therefore be complex, expensive, and lengthy. See, e.g. In re Genta Sec. Litig., No. CIV. A. 04-2123 JAG, 2008 WL 2229843, at *3 (D.N.J. May 28, 2008) ("This [securities fraud] action involves complex legal and factual issues, and pursuing them would be costly and expensive."); In re Datatec Sys., Inc. Sec. Litig., No. 04-CV-525 (GEB), 2007 WL 4225828, at *3 (D.N.J. Nov. 28, 2007) ("[R]esolution of [accounting and damages issues] would likely require extensive and conceptually difficult expert economic analysis. . . . Trial on [scienter and loss causation] issues would lengthy and costly to the parties.").

This factor supports approval.

## B. Class's Reaction to Settlement

The second *Girsh* factor "gauge[s] whether members of the class support the settlement." In re Prudential Ins. Co., 148 F.3d at 318. A lack of significant objections by class members weighs in favor of approving the settlement. In re Linerboard Antitrust Litig., 296 F. Supp. 2d 568, 578 (E.D. Pa. 2003)("unanimous approval of the proposed settlement[ ] by the class members is entitled to nearly dispositive weight in this court's evaluation of the proposed

settlement."); see also Bell Atl. Corp. v. Bolger, 2 F.3d 1304, 1313, n.15 (3d Cir. 1993) (stating

that "silence constitutes tacit consent to the agreement" where 30 objectors out of approximately

1.1 million shareholders was considered an "infinitesimal number").

Here, 4,155 sets of notice materials were mailed out to potential class members and

nominees. To date, no Class Member has objected to any aspect of the Settlement. Bravata Dec.

at ¶11. The deadline to object to the Settlement was October 20, 2016. Id. The deadline to seek

exclusion was October 5, 2016. Id. at ¶10. To date, only one Class Member has sought exclusion

from the Settlement.  Id. at ¶10; Rosen Dec. Ex. 4. The Class Member seeking exclusion,

moreover, would not be entitled to any share of the settlement; because he bought shares for less

than the post-disclosure price, he has no recognized loss. Rosen Dec. ¶12. Accordingly, the

reaction of the Settlement Class has been overwhelmingly favorable, thus supporting final

approval.

## C. Stage of Proceedings and Amount of Discovery Completed

The goal of the third Girsh factor is to "capture[] the degree of case development that

class counsel accomplished prior to settlement. Through this lens, courts can determine whether

counsel had an adequate appreciation of the merits of the case before negotiating." In re Cendant

Corp. Litig., 264 F.3d 201, 235 (3d Cir. 2001) (citing General Motors, 55 F.3d at 813). "Even

settlements reached at a very early stage and prior to formal discovery are appropriate where

there is no evidence of collusion and the settlement represents substantial concessions by both

parties. . . .  Indeed, courts in this district have approved settlements while the case was in the

pre-trial stage and formal discovery had not yet commenced."  In re Johnson & Johnson, 900 F.

Supp. 2d at 482; accord, e.g., In re Nat'l Football League, 821 F.3d at 436-37 ("To the extent

objectors ask us to require formal discovery before presuming that a settlement is fair, we decline

the invitation.  In some cases, informal discovery will be enough for class counsel to assess the value of the class claims and negotiate a settlement that provides fair compensation."). Courts in this Circuit frequently approve class action settlement despite the absence of formal discovery. See, e.g., Schuler v. Medicines Co., No. CV 14-1149 (CCC), 2016 WL 3457218, at *7 (D.N.J. June 24, 2016) (approving settlement prior to discovery because of counsel's investigation); In re Johnson & Johnson, 900 F. Supp.2d at 483 ("Even settlements reached at a very early stage and prior to formal discovery are appropriate where there is no evidence of collusion and the settlement represents substantial concessions by both parties.")

Here, Plaintiff and his counsel had a sufficient understanding of their claims and defenses in this action. Final approval is appropriate here because, by the time the parties negotiated the Stipulation, Lead Counsel (*i*) had had an opportunity to review the relevant public facts pertaining to plaintiffs' claims, (*ii*) had consulted with damages and forensic accounting experts, (*iii*) had engaged in briefing on defendants' motion to dismiss, (*iv*) had participated in mediation with a respected mediator, and (*v*) had received factual information from Roka in connection with the mediation.  Lead Counsel also was later able to conduct confirmatory discovery, with access to more than 377,000 pages of documents and interviews of three present or former Roka officials.

These efforts enabled plaintiffs and their attorneys to explore the facts and circumstances underlying their claims and to assess the potential risks and rewards of litigating versus settling. Accordingly, the adequacy of the discovery conducted to date favors approval of the settlement. See, e.g., In re Johnson & Johnson, 900 F. Supp. 2d at 482-83 (approving derivative settlement without formal discovery, but where the parties had "engaged in informal sharing of documents"

and "extensive motion practice" and where plaintiffs' counsel had reviewed publicly available materials and consulted with experts).

**D. Risks of Establishing Liability and Damages**

"The fourth and fifth [*Girsh*] factors survey the potential risks and rewards of proceeding to litigation in order to weigh the likelihood of success against the benefits of an immediate settlement."  In re Johnson & Johnson, 900 F. Supp. 2d at 483 (internal quotations omitted). "By evaluating the risks of establishing liability, the district court can examine what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them." General Motors, 55 F.3d at 814. In making this assessment, however, "a court should not conduct a mini-trial and must, to a certain extent, give credence to the estimation of the probability of success proffered by class counsel." In re Lucent Techs., Inc. Sec. Litig., 307 F. Supp. 2d 633, 644-45 (D.N.J. 2004) (internal quotations omitted). In complex cases, "[t]he risks surrounding a trial on the merits are always considerable." Weiss v. Mercedes-Benz of N. Am., 899 F. Supp. 1297, 1301 (D.N.J. 1995).

**1. Liability**

Plaintiff faced several obstacles if this case progressed. Chiefly, as Defendants pointed out in their Motion to Dismiss and the Amended Complaint acknowledged, the IPO Registration Statement warned that Roka had experienced false positives, and had had to redesign the Listeria test's testing process to address the problem. The IPO Registration Statement also disclosed that the new workflow might fail and that Roka might lose customers or traction as a result. *Id.*

Plaintiff alleged, based on the accounts of former Roka employees, that Roka's new process already had failed and that it already had lost customers as a result, thus making

Defendants' statements actionable. But the Post-Settlement Discovery complicates certain of the inferences to be drawn from Plaintiff's factual allegations:

   a.      It is true that Roka lost Hillshire Farm as an indirect customer (through a contract lab).  But notwithstanding any pre-IPO Hillshire *Listeria* false positive issues, Hillshire did not abandon Roka's tests until after the IPO. Rosen Dec. ¶9.a.

   b.      It is true that Roka lost customers before the IPO because of the *Listeria* false positives problem as Plaintiff alleges. But all but one of these were customers who had simply accepted Instruments for evaluation, while the existing customer was not a critical Roka customer. Rosen Dec. ¶9.b.

   c.      It appears that many customers, though not all, did successfully adopt the new workflow. Rosen Dec. ¶9.c.

While Lead Plaintiff contends he could nevertheless have establish liability, Plaintiff admits that the facts unearthed in Post-Settlement Discovery may have presented a substantial obstacle to recovery.

   Beyond these risks, even if Plaintiff prevailed on liability and damages at trial, Defendants would appeal the verdict, leading to greater expenses, further delays, and a recovery for the Class that may be less than the Settlement Amount or possibly no recovery at all. This Settlement allows the Class to recover promptly without incurring additional risk or costs.

**2. Damages**

   As to the amount of damages, while Plaintiff's prima facie damages in a Section 11 action are limited only by (as relevant here) the difference between the offering price and the value of a security at the time the suit was filed, Defendants have available to them an affirmative defense of negative causation. 15 U.S.C. §77k(e). In applying this negative causation

31

defense, courts limit recovery to the drop in stock price immediately following a corrective

disclosure. See In re Royal Dutch/Shell Transp. Sec. Litig., 404 F. Supp. 2d 605, 610 (D.N.J.

2005) ("Both prior to and after the enactment of the PSLRA in 1995, "[t]he damages of a

purchaser were always understood to be the difference between the purchase price and the true

value of the shares (adjusted for any negative causation) as disclosed after the revelation of the

fraud to the public, followed by a reasonable period (usually no longer than a week or ten days)

during which the market took cognizance of the fraud and the publicly traded price was

presumed, under the 'efficient market' hypothesis ..., to reflect an adjustment for the fraud.")

(quotation omitted).  Here, that means the Class could recover for the stock drops on November

7, 2014, of $5.34, and potentially on March 27 and 30, 2015, of $0.88.

Defendants, however, would also argue that the stock drops following the corrective

disclosures were caused by things unrelated to the alleged misrepresentations. First, Defendants

have already argued that the damages on March 27 and 30, 2015, were not caused by the

materialization of the concealed risk, because the risk had already been fully revealed on

November 7, 2014. Defendants argue, and the Post-Settlement Discovery appears to have

substantiated, that the reason Roka was unable to secure new customers after the

November 6, 2014 earnings call was that on the call it had publicly committed to developing a

new *Listeria* test. Defendants' argument, if accepted, cuts damages from $30.9 million to $26.6

million.

Second, the Registration Statement did disclose that there was some risk that the new

process would not work and that Roka would lose customers as a result. Defendants would argue

that a portion of the November 7, 2014 drop was caused by the materialization of this disclosed

risk – not by the fact that, as of the time of the IPO, the risk of losing customers had already

occurred. Plaintiff would have to respond to Defendants' argument with expert evidence. Thus, there was substantial risk that the amount of damages recoverable at trial would be significantly reduced.

**E. Risks of Maintaining Class Certification**

The risk of obtaining and maintaining class certification through trial also supports approval of the Settlement. Plaintiffs had not yet moved for class certification at the time of the settlement. Defendants would oppose class certification if this case proceeded. Plaintiff would have to rely on expert testimony to establish that damages can be established on a class-wide basis. Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co., 301 F.R.D. 116, 141-42 (S.D.N.Y. 2014) (certifying class for liability only in Section 11 case because plaintiffs had not provided an expert model permitting class-wide adjudication of damages). Defendants' expert would conclude that damages could not be established on a class-wide basis, resulting in a battle of the experts at class certification and trial that Plaintiff might lose. See id. Should Defendants succeed, the Court would need to hold mini-trials on damages; it is not clear whether most investors would appear for such trials, given the small amounts of money at stake. The risk that the Court would deny class certification further supports the settlement. *See Rent-Way*, 305 F. Supp. 2d at 506.

Moreover, even if the Class was certified for other than settlement purposes, "[t]here will always be a 'risk' or possibility of decertification, and consequently the court can always claim this factor weighs in favor of settlement." In re Prudential Ins. Co., 148 F.3d at 321; see also In re Rent-Way Securities Litigation, 305 F. Supp. 2d 491, 506-07 (W.D. Pa. 2003) ("[A]s in any class action, there remains some risk of decertification in the event the Propose[d] Settlement is

33

not approved. While this may not be a particularly weighty factor, on balance it somewhat favors approval of the proposed Settlement.").

**F. Defendants' Ability to Pay**

This *Girsh* factor "addresses whether Defendants could withstand a [monetary] judgment for an amount significantly greater than the [proposed] Settlement." In re Johnson & Johnson, 900 F. Supp. 2d at 484 (internal quotations omitted); Cendant, 264 F.3d at 240 (same).

Since its founding, Roka has consistently incurred losses, with an accumulated deficit of $109.1 million by March 31, 2014. The accumulated deficit reached $185.3 million by June 30, 2016. [Roka BioScience, Inc., Form 10-Q for the 3 months ended June 30, 2016, at 3, filed August 5, 2016]. Yet Roka only had cash, cash equivalents, and short-term investments of $16.8 million as of June 30, 2016. *Id.* Indeed, at the time that the motion briefs were filed, Roka's market capitalization was about $11 million – down 95% since the IPO.

Defendants held three applicable insurance policies, each with a face amount of $5 million. Yet these policies deplete as they pay Defendants' attorneys' fees. Given the costs of modern litigation, these policies would be mostly depleted by the time of trial. Thus, the Settlement today is more than what Defendants could potentially pay down the road after their insurance coverage is depleted through further litigation.

Given Roka's financial state and the status of its insurance policies, this factor weighs in favor of approval.

**G. Range of Reasonableness of Settlement Fund**

"The last two [Girsh] factors evaluate whether the settlement represents a fair and good value for a weak case or a poor value for a strong case." In re Johnson & Johnson, 900 F. Supp. 2d at 484 (internal quotations omitted). "In conducting this evaluation, it is recognized that

settlement represents a compromise in which the highest hopes for recovery are yielded in exchange for certainty and resolution and [courts should] guard against demanding to[o] large a settlement based on the court's view of the merits of the litigation." *Id.* at 484-85 (internal quotations omitted). These factors inquire "'whether the settlement is reasonable in light of the best possible recovery and the risks the parties would race if the case went to trial.'" Pro v. Hertz Equip. Rental Corp., No. CIV.A. 06-3830 DMC, 2013 WL 3167736, at *5 (D.N.J. June 20, 2013) (quoting Prudential, 148 F.3d at 322).

According to Cornerstone Research, in 2015, cases with damages of less than $50 million settled for a median of 6.7% of total maximum estimated damages. [Laarni T. Bulan, *et al*, Securities Class Action Settlements: 2015 Review and Analysis, at 9 (Rosen Dec. Ex. 6)]. According to Lead Plaintiffs' memorandum in support of preliminary approval [at 9], "Lead Plaintiff's maximum estimate of class damages (the Class wins on every point and the factfinder accepts the Class's damages model) is approximately $30.9 million," so the Settlement Amount of $3.275 million "recovers about 10.5% of maximum potential damages" – above the median recovery in securities class action settlements. Even taking into account Defendants' claim that Plaintiff could not recover for the March 27-30 price drop, the Settlement Amount of $3.275 million, against maximum likely damages of $26.6 million, recovers 12.3% of maximum damages – almost twice as much as the median settlement. After the parties initial briefing, Lead Plaintiff submitted a reply in further support of the settlement on November 2, 2016. In the Reply, Lead Counsel represented that, as of November 2, 2016, SCS (the claims administrator) had received 1,791 claim forms, including 482 valid claims representing recognized losses of $17,698,523 and 44 deficient claims representing losses of $2,373,742. At the November 9, 2016 hearing, Lead Counsel represented on the record that, accordingly, the actual recovery in this

case would be between 16% and 18.5% of claimed losses, depending upon how many of the deficient claims, if any, are ultimately cured. Actual recovery will thus exceed either of the parties initial estimates and will be well above the median settlement in this area.

The recovery is particularly noteworthy in light of the obstacles to recovery. In this case, Plaintiff could not point to an accounting restatement, derivative action brought on behalf of the company, or civil or criminal government investigation. Nor could Plaintiff point to an admission of wrongdoing from Roka, nor even an internal investigation of wrongdoing.

Courts in this Circuit have routinely approved settlements providing similar percentages of recovery – or even far less.  See, e.g., In re Viropharma Inc. Sec. Litig., 2016 WL 312108, at *14 (E.D. Pa. Jan. 25, 2016) (approving settlement of 9% to 10% of maximum estimated loss, and noting that, between 1996 and 2014, median settlement amount was 4.8% of projected investor losses ranging between $50 million and $99 million); In re Rite Aid Corp. Sec. Litig., 146 F. Supp. 2d 706, 714-15 (E.D. Pa. 2001) (noting that securities class actions that settled between 1995 and 1999 recovered between 5.5% and 6.2% of estimated losses); see also, e.g., In re Amer. Bus. Fin. Servs. Inc. Noteholders Litig., 2008 WL 4974782, at *3, *9, *13 (E.D. Pa. Nov. 21, 2008) (approving settlement for 2.5% of damages); In re Ikon Office Solutions, Inc., Sec. Litig., 194 F.R.D. 166, 183-84 (E.D. Pa. 2000) (approving settlement for 5.2% to 8.7% of claimed damages).

The Court also observes that the mediator in this case, Judge Hochberg, declared that the Settlement "constitutes a good result for the plaintiffs". Hochberg Dec. ¶20.

The Settlement Amount is therefore well within the range of reasonableness. Having found that the Girsh factors weigh in favor of approval, the Court turns next to the Prudential factors.

36

**H. Maturity of Underlying Issues and Existence of Other Litigation**

The Third Circuit suggested in <u>Prudential</u> that courts may consider such additional factors as "the maturity of the underlying substantive issues" and the existence and probable outcomes of other individual and/or class actions involving the same underlying facts.  <u>In re Prudential Ins. Co.</u>, 148 F.3d at 323.  Those considerations are inapposite here.

Unlike some other types of class actions (such as certain consumer and product-liability class actions), this securities class action does not present particularly novel legal or factual issues that need to mature before the Court can assess the fairness and adequacy of the proposed settlement.  Nor have any other individual or class actions been filed against Roka concerning the IPO Registration Statement.

**I. Availability of Opt-Out Rights**

The <u>Prudential</u> court held that courts may also consider the availability of opt-out rights. 148 F.3d at 323.  Such rights exist here.  Dissatisfied potential Class Members are free to exclude themselves from the proposed settlement if they follow the Court's instructions for opting out.

**J. Reasonableness of Attorneys' Fees**

The *Prudential* decision also authorizes consideration of the reasonableness of the plaintiffs' request for attorneys' fees.  *Id.*  The fee request in this case does not present any issues. First, the parties reached an agreement on the Settlement Amount without any discussion of fees, which will be paid out of the settlement fund in an amount approved by the Court.  The Settlement Agreement itself says nothing about the amount of fees that plaintiffs may seek; nor does it provide that defendants will not object to a fee request below any particular amount.  This case thus does not raise the specter of a "clear sailing" agreement, because the settlement does not provide either for "the payment of attorneys' fees separate and apart from class funds,"

37

Laguna v. Coverall N. Am., Inc., 753 F.3d 918, 925 (internal quotations omitted), *vacated as moot after settlement*, 772 F.3d 608 (9th Cir. 2014), or for defendants' agreement not to contest class counsel's fee request up to a particular amount, see, e.g., Weinberger v. Great N. Nekoosa Corp., 925 F.2d 518, 524 (1st Cir. 1990) (describing "clear sailing agreement" as one in which defendant "would not contest the [fee] petition and would pay any sum up to [a specified amount] awarded by the district court").

Second, plaintiffs' fee request is independent of the proposed settlement. The Stipulation provides that the settlement – if approved – can take effect regardless of how the Court rules on plaintiffs' fee request and that plaintiffs cannot terminate the settlement based on the amount of fees awarded. [§ XII.C, at 44]

Third, the Court will award, as will be explained later, a reasonable fee considering the work performed and the interests of the class members.

**K. Reasonableness of Claim-Processing Procedures**

The claim-processing procedures are the standard ones used in securities class-action settlements. Class Members may submit Claim Forms to the Claims Administrator, which will make initial determinations about eligibility for settlement relief. Any Class Member whose claim has been rejected in whole or in part may contest the rejection by submitting an explanation of his or her position to Lead Counsel. If the dispute cannot be resolved, Lead Counsel will submit it to the Court for final decision. [§ I.E, at 26-27]

Having considered all of the Girsh and Prudential factors, this Court approves the settlement as fair and reasonable.

## VIII. ATTORNEY'S FEES

Lead Counsel seeks an award of attorneys' fees of one-third of the $3.275 million Settlement Amount, or $1,091,666. The Court is persuaded by Lead Counsel's submissions that a significant fee is warranted in this case, but finds that an award of 30% of the recovery, or $982,500, better protects the interests of the class members, while still adequately compensating class counsel.

Attorneys' fees are typically assessed through the percentage-of-recovery method or through the lodestar method. In re AT&T Corp. Secs. Litig., 455 F.3d 160, 164 (3d Cir. 2006). The percentage-of-recovery method applies a certain percentage to the settlement fund. See Welch & Forbes, Inc. v. Cendant Corp., 243 F.3d 722, 732 n.10 (3d Cir. 2001). The lodestar method multiplies the number of hours class counsel worked on a case by a reasonable hourly billing rate for such services. In re AT&T, 455 F.3d at 164.

In common fund cases such as this one, the percentage-of-recovery method is generally favored because "it allows courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure.'" In re Rite Aid Corp. Sec. Litig., 396 F.3d. 294, 300 (3d Cir. 2005) (quoting omitted); In re Lucent Technologies, 327 F.Supp.2d at 431. However, the Third Circuit has recommended that district courts use the lodestar method to cross-check the reasonableness of a percentage-of-recovery fee award. See Rite Aid, 396 F.3d at 305. The cross-check is performed by dividing the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier. "[W]hen the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award." Rite Aid, 396 F.3d at 306. The lodestar cross-check, while useful, should not displace a district court's primary reliance on the percentage-of-recovery method. In re AT&T, 455 F.3d at 164.

39

**A. Lodestar Cross-Check**

Before the Court applies the percentage-of-recovery method therefore, it will briefly delineate the total lodestar amounts for attorneys, paralegals and law clerk time calculated at current market rates and by using those numbers, perform a lodestar cross-check to confirm the reasonableness of the fee request. Having reviewed the attorneys' declarations, the Court is satisfied that the hourly rate charged for each of the attorneys and his/her staff is based upon a reasonable hourly billing rate for such services in the given geographical area, the nature of the services provided and the experience of the lawyer. Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 (3d Cir. 2000). Having determined that the hourly rates are reasonable and the amount of hours spent prosecuting this case is also reasonable, the Rosen Law Firm's lodestar i.e., the value of its work had it been paid on an hourly basis, is $317,500, for 520.9 hours at a blended hourly rate of $610 per hour. *See* Rosen Fee Dec. ¶3. This includes, among other things, the time spent in the initial investigation of the case, researching legal issues, consulting with a scientific expert, preparing and filing the Amended Complaint, briefing Defendants' request to strike confidential witness allegations, opposing Defendants' motion to dismiss, consulting with a damages expert, drafting a mediation brief, preparing for and attending mediation, reviewing documents produced in confirmatory discovery, negotiating and drafting the Settlement and the Settlement Agreement, drafting papers in support of preliminary approval, overseeing claims administration, and drafting papers in support of final approval. *Id.* The multiplier generated here by the ratio of the requested fee to Lead Counsel's lodestar is 3.4.

In this circuit, multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied. In re AT&T, 455 F.3d at 172; see e.g., Weiss, 899 F.Supp. at 1304; Muchnik v. First Fed. Savings & Loan Ass'n, 1986 WL 10791 (E.D. Pa.

1986).  Lead Counsel's proposed 3.4 multiplier is on the higher end of the range, which gives this Court pause due to the early stage at which the litigation was settled. In In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 742 (3d Cir. 2001), the Third Circuit observed that "[i]n all the cases in which high percentages were applied to arrive at attorneys' fees, the courts explained the extensive amount of work that the attorneys had put into the case, and appropriately the lodestar multiplier in those cases never exceeded 2.99." When, as in Cendant, litigation was settled at an early stage, the Third Circuit, in reversing the district court below, "strongly suggest[ed] that a lodestar multiplier of 3 . . . is the appropriate ceiling for a fee award, although a lower multiplier may be applied in the District Court's discretion." In re Cendant, 243 F.3d at 742. See also Rite Aid, 396 F.3d at 303 (explaining that the lodestar multiplier of 3 was appropriate in Cendant because the case was "neither legally nor factually complex," was of short duration, involved a limited amount of motion practice, and required only 5,600 hours of work by counsel). Here, while the Court recognizes the good work of Lead Counsel in bringing this matter to a prompt resolution, the matter was settled before the adjudication of the motion to dismiss, was not legally or factually complex, necessitated only confirmatory discovery, and required the expenditure of only 521 hours by Lead Counsel.

As such, the Court finds that while a multiplier on the higher end of the accepted range is warranted, a multiplier of 3.4 is simply too high in this case of short duration, uncomplicated legal issues, and relatively limited hours. Looking to the Third Circuit's decisions in the area of securities settlements, the Court is persuaded that a 30% fee of $982,500 is appropriate. I look to, for example, In re Veritas Software Corp. Sec. Litig., 396 F. App'x 815, 818 (3d Cir. 2010), where the Third Circuit affirmed a final approval of settlement, observing that "[w]hile the 30% fee is admittedly large, the District Court took into account that class counsel spent four years,

41

and thousands of hours of attorneys' labor, litigating this case. The final lodestar multiplier of 1.52 was well within the range of attorneys' fees awarded and approved by this Court." Recalculating the lodestar in this case on the basis of a 30% award, therefore, gives rise to a multiplier of 3.09, which this Court finds acceptable.

## B. Percentage of Recovery

When analyzing a fee award in a common fund case under the percentage-of-recovery method, the Court considers several factors, many of which are similar to the Girsh factors as enunciated previously. See Rite Aid, 396 F.3d at 301 n.9. These include:

(1) the size of the fund created and the number of persons benefitted;

(2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel;

(3) the skill and efficiency of the attorneys involved;

(4) the complexity and duration of the litigation;

(5) the risk of nonpayment;

(6) the amount of time devoted to the case by plaintiffs' counsel; and

(7) the awards in similar cases.

Id. at 301 (citing Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000).  This list is not exhaustive.  In Prudential, the Third Circuit noted three other factors that may be relevant and important to consider: (1) the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations, Prudential, 148 F.3d at 338; (2) the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained, Id. at 340; and (3) any "innovative" terms of

settlement, Id. at 339.  The fee award reasonableness factors "need not be applied in a formulaic way" because each case is different, "and in certain cases, one factor may outweigh the rest." Rite Aid, 396 F.3d at 301 (quoting Gunter, 223 F.3d at 195 n.1).  The Court may give some of these factors less weight in evaluating a fee award. See In re Cendant, 264 F.3d at 283; Prudential, 148 F.3d at 339.  Moreover, the analysis of the Gunter factors overlaps with the Grish factors used to assess the appropriateness of the settlement.  In that regard, the Court will refer to its earlier findings when reviewing this fee application.

**1. The Fund Is Substantial and Confers a Benefit Upon The Class Members**

The first *Gunter* factor "consider[s] the fee request in comparison to the size of the fund created and the number of class members to be benefitted." Rowe v. E.I. DuPont de Nemours & Co., 2011 WL 3837106, at *18 (D.N.J. Aug. 26, 2011). That is because the sheer magnitude of damages has a heavy impact on the amounts defendants are willing to pay to settle their liability. Bredbenner v. Liberty Travel, Inc., No. CIV.A. 09-1248 MF, 2011 WL 1344745, at *19 (D.N.J. Apr. 8, 2011) (awarding fee of one third of settlement fund because case involved relatively small fund and relatively few class members). Thus, granting counsel a similar percentage of a smaller fund may simply punish counsel for having litigated a smaller case. Moreover, because of fixed costs and economies of scale, attorneys' fees and costs do not increase dollar-for-dollar with the size of the case. Thus, it takes a greater percentage of the settlement to support litigation in a smaller case.

As securities class actions go, this is a relatively small one. The median damages in securities class action which settled in 2015 was $330 million. [Laarni T. Bulan, et al, Securities Class Action Settlements: 2015 Review and Analysis, at 7 (Rosen Dec. Ex. 5)]. In this case, total maximum damages are about $30.9 million – ten times less. The $3.275 million Settlement,

while substantial, is plainly not a mega-fund. *Id.* That said, in this case, only 2,631 potential class members have been identified. Bravata Dec. ¶5. Moreover, so far the fund has only received 482 valid claims and 44 deficient claims that are potentially curable. This is a relatively small number for a securities class action; the fact that there are relatively fewer Class Members ensures that each Class Member will receive a proportionally greater payment.

**2. To Date No Class Members Have Objected To The Fee Request**

The Individual Notice explicitly provided that Lead Counsel would apply for an award of attorneys' fees of up to one-third of the Settlement. The Notice also advised Class Members that they could object to the Settlement and explained the procedure for doing so. *Id.* As of this date, no Class Member has objected to the attorneys' fees or expenses requested. Bravata Dec. ¶10. Additionally, to date only one Class Member – who bought only 280 shares and would not have been entitled to any Settlement proceeds because he has no recognized losses – has sought to be excluded from the Settlement. Rosen Dec. Ex. 4. The deadline to object to the Settlement was October 20, 2016. Bravata Dec. ¶11. The deadline to opt out of the Settlement was October 5, 2016. *Id.* ¶10.

Accordingly, the Class's reaction strongly supports a fee award at or beneath the cap set forth in the Individual Notice. See, e.g., <u>Chemi v. Champion Mortgage</u>, No. 2:05-CV-1238(WHW), 2009 WL 1470429, at *4 (D.N.J. May 26, 2009) (lack of objections and single opt-out weighed strongly in favor of settlement). This Court believes that an award below the ceiling set forth in the Individual Notice is appropriate to best protect the interests of the class and finds a 30% fee reasonable and within the expectations established by the notice sent to the class members.

**3. Lead Counsel Prosecuted This Action With Skill And Efficiency**

The skill and efficiency factor under *Gunter* also weighs heavily in favor of a 30% award. Lead Counsel's skill and efficiency is "measured by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel." Hall v. AT&T Mobility LLC, No. CIV.A. 07-5325 JLL, 2010 WL 4053547, at *19 (D.N.J. Oct. 13, 2010).

Lead Counsel's success in quickly bringing this litigation to a successful conclusion is perhaps the best indicator of the experience and ability of the attorneys involved.

The experience of Lead Counsel is set forth in firm resume of the Rosen Law Firm attached as Exhibit 2-A to the Rosen Declaration. As that submission shows, Lead Counsel is highly experienced in the complex field of securities fraud class action litigation. See Knox v. Yingli Green Energy Holding Co. Ltd., 136 F. Supp. 3d 1159, 1165 (C.D. Cal. 2015) ("The Rosen Law Firm is "highly qualified [and] experienced" in securities class actions").

The quality and vigor of opposing counsel is also relevant in evaluating the quality of the services rendered by Lead Counsel. See, e.g., Ikon, 194 F.R.D at 194. Defense counsel in this case were skilled attorneys from Proskauer Rose LLP, one of the leading securities litigation defense firms in the country. Defendants' lead counsel was Ralph Ferrara, a former General Counsel of the SEC who has been recognized by Chambers and Best Lawyers as one of the top securities litigation and white collar defense practitioners in the U.S. Achieving this favorable Settlement while opposing Proskauer and Mr. Ferrara satisfies this Gunter factor.

**4. The Complexity, Expense, and Likely Duration of Litigation Weigh in Favor of the Court's Award**

The fourth <u>Gunter</u> factor is intended to capture "the probable costs, in both time and money, of continued litigation" and favors the requested fee. <u>See In re General Motors</u>, 55 F.3d at 812 (<u>quoting Bryan v. Pittsburgh Plate Glass Co.</u>, 494 F.2d 799, 801 (3d Cir. 1974)). Although the legal issues in this case are not particularly complex, securities class actions are by nature particularly expensive to prosecute, usually requiring expert testimony on, at least questions of damages and loss causation. The $3.275 million recovery is substantial in light of the recoverable damages, and the substantial risks and expenses that the Class would have faced by litigating to trial. In this case even were Plaintiffs' claims to survive Defendants' motion to dismiss, Plaintiffs would then be obligated to conduct discovery, move for class certification, and face Defendants' motion for summary judgment. Then, by surviving these steps, Plaintiffs would need to take their case to a jury. If the jury found in Plaintiffs' favor, they would still face Defendants' post-trial motions and likely appeal. Collecting a judgment requires crossing every one of these hurdles, but each of these steps involves significant risks. <u>In re HiCrush Partners L.P. Sec. Litig.</u>, No. 12-CIV-8557 CM, 2014 WL 7323417, at *16 (S.D.N.Y. Dec. 19, 2014) ("Over the last five years, nearly 48% of all securities class actions have been dismissed on motions prior to trial, while plaintiffs who succeeded at trial have found their judgments overturned on post-trial motions or appeal").

Considering the magnitude and expense of this securities case, a 30% fee award is reasonable.

**5. Lead Counsel Undertook the Risk of Non-Payment**

Lead Counsel undertook this action on an entirely contingent fee basis, taking the risk that the litigation would yield no or very little recovery and leave it uncompensated for its time, as well as for its out-of-pocket expenses. Courts across the country have consistently recognized that the risk of receiving little or no recovery is a major factor in considering an award of attorneys' fees. In re Schering-Plough Corp. Enhance Sec. Litig., No. CIV.A. 08-2177 DMC, 2013 WL 5505744, at *28 (D.N.J. Oct. 1, 2013). The risk of non-payment is especially high in securities class actions, as they are "notably difficult and notoriously uncertain." See Trief v. Dun & Bradstreet Corp., 840 F. Supp. 277, 281 (S.D.N.Y. 1993). Legal precedents are continually making it more difficult to plead securities class actions. In re BP p.l.c. Sec. Litig., 852 F. Supp. 2d 767, 820 (S.D. Tex. 2012) ("The Court is acutely aware that federal legislation and authoritative precedents have created for plaintiffs in all securities actions formidable challenges to successful pleading.").

Here, Lead Counsel undertook this litigation on a contingency basis and with no guarantee its time or expenses would be reimbursed. In light of the difficulty of undertaking such a, Lead Counsel should be reimbursed for its time and expenses.

**6. Lead Counsel Spent Significant Time Investigating and Litigating the Case**

The sixth Gunter factor looks at counsel's time devoted to the litigation. Gunter, 223 F.3d at 199. This factor is usually considered with the lodestar cross-check to look at reasonableness of counsel's requested fee. I have reviewed the affidavits in this case and find the over 520 hours expended by the Rosen Law Firm to be significant, although not necessarily as extensive as those observed in some other securities actions that progress to a later stage of litigation.

47

**7. The Court's Award Is Consistent With Awards in Similar Cases**

The 30% fee the Court awards here is appropriate and comfortably within the range of fees typically awarded. While there is no benchmark for the percentage of fees to be awarded in common fund cases, the Third Circuit has observed that fee awards generally range from 19% to 45% of the settlement fund. General Motors, 55 F.3d at 822. For smaller securities fraud class actions, "courts within this Circuit have typically awarded attorneys' fees of 30% to 35% of the recovery, plus expenses." In re Ravisent Techs., Inc. Sec. Litig., No. CIV.A.00-CV-1014, 2005 WL 906361, at *11 (E.D. Pa. Apr. 18, 2005) (collecting cases). The 30% fee awarded here is in the typical range for settlements in this Circuit and is appropriate given the early stage at which this litigation was resolved. Schuler v. Medicines Co., No. CV 14-1149 (CCC), 2016 WL 3457218, at *8 (D.N.J. June 24, 2016) (awarding one third of settlement as fees in case that settled before decision on motion to dismiss); In re Merck & Co., Inc. Vytorin Erisa Litig., No. CIV.A. 08CV-285DMC, 2010 WL 547613, at *11 (D.N.J. Feb. 9, 2010) "review of 289 settlements demonstrates "average attorney's fees percentage [of] 31.71% with a median value that turns out to be one-third") (quoting In re Remeron Direct Purchaser Antitrust Litig., No. CIV.03-0085 FSH, 2005 WL 3008808, at *15 (D.N.J. Nov. 9, 2005)); In re Safety Components, Inc. Sec. Litig., 166 F. Supp. 2d 72, 101 (D.N.J. 2001) (awarding one third and citing representative fee awards, which ranged from 27.5% to 33.8% with a median of 33⅓%).

**8. The $3.275 Million Recovery Is Solely Attributable to the Efforts OF Class Counsel**

The result achieved for Class Members here is solely attributable to the efforts and skill of Class Counsel.  Unlike in many securities class actions, here Class Counsel did not have the advantage of a Securities and Exchange Commission investigation or any other governmental enforcement proceeding.  Class Counsel assumed the entire risk and expense of prosecuting the

case and negotiated this favorable settlement without the assistance of any other governmental or private party.  The fact that Lead Counsel received no help from any government investigation is a "significant factor" supporting the fee award. AT&T, 455 F.3d at 173 (citing Prudential, 148 F.3d at 338); In re Flonase Antitrust Litig., 951 F. Supp. 2d 739, 749 (E.D. Pa. 2013).

**9. The Awarded Fee Percentage Is Consistent With Contingent Fee Arrangements in Privately Negotiated Non-Class Litigation**

A 30% fee is also consistent with typical fee awards in non-class cases. See In re RJR Nabisco, Inc. Sec. Litig., No. 818 (MBM), 1992 WL 210138, at *7 (S.D.N.Y. Aug. 24, 1992) ("What should govern [contingent fee] awards is not the essentially whimsical view of a judge, or even a panel of judges, as to how much is enough in a particular case, but what the market pays in similar cases."). If this were an individual action, the customary contingent fee would likely range between 30 and 40 percent of the recovery. See, e.g., Ikon, 194 F.R.D. at 194; *Blum*, 465 U.S. at 903 n. *19 (Brennan, J., concurring) ("In tort suits, an attorney might receive one-third of whatever amount the plaintiff recovers. In those cases, therefore, the fee is directly proportional to the recovery."). Lead Counsel's fee of 30% of the Settlement fund comports with these private standards. Further, Lead Plaintiff supports Lead Counsel's fee application. Yedlowski Dec. ¶7.

Thus, this factor supports the Court's award of 30% of the Settlement Fund to Lead Counsel.

**B. Lead Counsel's Expenses Were Reasonable and Necessary to Litigate the Action**

"Counsel in common fund cases is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the case." In re Cendant Corp., Deriv. Action Litig., 232 F. Supp. 2d 327, 343 (D.N.J. 2002). In this

case, Class Members stated that Lead Counsel may seek reimbursement of expenses not to exceed $50,000. (Dkt. #45-4, at 2). Lead Counsel requests that this Court reimburse the $20,972.82 of litigation expenses that counsel advanced in connection with this Action. Rosen Fee Dec.¶6. This Court finds that these expenses, which are set forth in the Rosen Declaration, were reasonably necessary for the prosecution of this litigation. Rosen Fee Dec. ¶7. Approximately $19,150 of Lead Counsel's expenses consist of expert and investigation and mediation fees. *See* Rosen Fee Dec. ¶6. The remaining $1,800 consists primarily of press releases notifying the Class and online legal research. *Id.* Courts have held that all of these items are properly charged to the Class. In re Cendant Corp., Derivative Action Litig., 232 F. Supp. 2d at 344 (consultants and computer-assisted research); Beckman v. KeyBank, N.A., 293 F.R.D. 467, 482 (S.D.N.Y. 2013) (mediator's fees); Katz v. China Century Dragon Media, Inc., No. LACV1102769JAKSSX, 2013 WL 11237202, at *8 (C.D. Cal. Oct. 10, 2013) (press releases). No opposition to the expense application has been received. Bravata Dec. ¶11.

## C. Lead Plaintiff is Entitled to a Nominal Award

Lastly, Lead Counsel requests an award of $3,000 to Lead Plaintiff Stanley Yedlowski for his time committed to this litigation. The PSLRA does not provide for incentive awards for lead plaintiffs to compensate them for their service as lead plaintiffs. However, it does acknowledge that "Nothing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class." 15 U.S.C. 78u-4(a)(4). "The Conference Committee recognizes that lead plaintiffs should be reimbursed for reasonable costs and expenses associated with service as lead plaintiff, including lost wages, and grants the courts discretion to award fees accordingly." H.R. Conf. Rep. No. 369, 104th Cong., 1st Sess. 35

(1995). "[T]he Third Circuit favors encouraging class representatives, by appropriate means, to create common funds and to enforce laws—even approving 'incentive awards' to class representatives." In re Schering-Plough Corp. Enhance Sec. Litig., No. CIV.A. 08-2177 DMC, 2013 WL 5505744, at *56 (D.N.J. Oct. 1, 2013).

In this case, Lead Plaintiff (a) reviewed pleadings; (b) discussed the case with Lead Counsel; (c) approved settlement authority for and made himself available at the Mediation; and (d) independently followed developments regarding Roka. Yedlowski Dec. ¶¶3, 5. In total, Lead Plaintiff spent 75 hours on this case. Id. ¶ 6. These are the kinds of activities that warrant reimbursement for class representatives for their lost wages and business opportunities. ScheringPlough, 2013 WL 5505744, at *56 (reviewing pleadings, corresponding with Lead Counsel, and preparing for and attending mediation); In re Par Pharm. Sec. Litig., No. CIV.A. 06-3226 ES, 2013 WL 3930091, at *11 (D.N.J. July 29, 2013) (similar); Schuler, 2016 WL 3457218, at *11 (reviewed filings, conferred with lead counsel, remained apprised about the case and the company).

The Notice disseminated to the Class informed Class Members of Lead Plaintiff's intention of seeking a reimbursement for the reasonable time and expenses of Lead Plaintiff in pursuing the litigation not to exceed $3,000. No Class member has objected to this award. Bravata Dec. ¶11. Courts regularly make similar awards to lead plaintiffs. In re Par Pharm. Sec. Litig., No. CIV.A. 06-3226 ES, 2013 WL 3930091, at *11 (D.N.J. July 29, 2013) (awarding $18,000 to lead plaintiff); Ray v. Lundstrom, No. 4:10CV3177, 2012 WL 5458425, at *5 (D. Neb. Nov. 8, 2012) (awarding $2,000 in case that settled before discovery); Schuler, 2016 WL 3457218, at *11 ($3,500 in case that settled before discovery).

51

Finally, Lead Plaintiff was one of only two investors who moved for appointment. Lead Plaintiff's willingness to take on responsibilities in a difficult case should be rewarded. Accordingly, the Court awards Lead Plaintiff the nominal amount of $3,000 as compensation for his time and efforts in representing the Class.

## IX. CONCLUSION

Lead Plaintiff's motion for final approval of the parties' $3.275 million settlement is granted. Lead Plaintiff's motion for the award of attorney's fees is granted, Lead Counsel is awarded $982,500 in fees and $20,972.82 in costs, and Lead Plaintiff is awarded the nominal sum of $3,000, all payable from the settlement fund.

Dated:  _____11/10/2016_____        _____/s/ Freda L. Wolfson_____
                                             The Honorable Freda L. Wolfson
                                             United States District Judge